IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    Case Nos.: 1:08cr23/WTH/GRJ
                                                                    1:13cv209/WTH/GRJ

TIMOTHY ROBERT TREFFINGER

---

## <u>REPORT AND RECOMMENDATION</u>

This matter is before the court upon Petitioner's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255.   (ECF No. 144.) The Government has filed a response (ECF No. 146) and Petitioner has filed a reply.   (ECF No. 150.)   The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.   See N.D. Fla. Loc. R. 72.2; see also 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).   The undersigned conducted an evidentiary hearing on February 3, 2017 and the parties provided post-hearing summaries and argument.   (ECF Nos. 166, 167.) After a careful review of the record and the arguments presented, the Court concludes that Petitioner's motion should be denied.

## BACKGROUND

Petitioner was charged in a five count indictment with manufacture and possession with intent to distribute more than 100 marijuana plants (Count One); possession of a firearm in furtherance of a drug trafficking crime (Count Two); possession of a destructive device in furtherance of a drug trafficking crime (Count Three); possession and making destructive devices not registered in the National Firearms Registration and Transfer Record (Count Four); and possession of a firearm not registered in the National Firearms Registration and Transfer Record (Count Five). The charges stemmed from evidence uncovered after Petitioner consented to a search of his rural property during law enforcement's investigation of a tip regarding illegal activity allegedly taking place there.

Petitioner proceeded to trial, represented by retained counsel Stephen N. Bernstein, and the jury convicted him on all counts.   (ECF Nos. 54-57, 91-94.)   He was sentenced to 97 months imprisonment on Counts One, Four, and Five to run concurrent, a consecutive 60 month term on Count Two, and a consecutive 360 month term on Count Three.

The sentence included a term of supervised release, a $500 special assessment and a $2000 fine. (ECF No. 67, 73, 74.)

Petitioner appealed his convictions, and the Eleventh Circuit affirmed in part and reversed in part on March 8, 2012.   (ECF No. 122.)   It found that Petitioner was improperly convicted on both Counts Two and Three given that there was a single predicate offense (Count One), and vacated his conviction on Count Two.   The Eleventh Circuit also vacated the sentences imposed on Counts One, Four, and Five because Petitioner's sentence had been based upon a guidelines calculation error.   It rejected Petitioner's challenge to the sufficiency of the evidence.

Upon remand, the court sentenced Petitioner to a term of 66 months imprisonment on Counts One, Four and Five, followed by a consecutive statutory minimum term of 360 months on Count Three.   Judgment was entered on November 15, 2012. (ECF Nos. 137, 138.)   Petitioner did not appeal following entry of the amended judgment, but filed the instant motion to vacate in October of 2013.

In the present motion, Petitioner raises two related grounds for relief. He contends that counsel was constitutionally ineffective when he failed to

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

raise a fourth amendment challenge to the warrantless entry and search of Treffinger's property as well as his allegedly involuntary consent to search. The Government opposes the motion.

## SUMMARY OF FACTS

On July 14, 2008, special agents and task force officers from the Gainesville DEA office, along with investigators from the Alachua County Sheriff's office, went to Petitioner's property at 15508 SW 149th Place in Archer Florida acting on a tip from an individual later identified as David Beigel.   The property, a five-acre parcel, contained a single story home, a single-wide mobile home, a large pull-behind travel trailer and two metal outbuildings.

Special Agent Wayne Andrews, the case agent, and others entered an adjacent parcel of land from where Andrews testified that he could smell the distinctive odor of marijuana plants as well as hear the hum typical of indoor marijuana grow operations.   (ECF No. 91 at 65-67.)   After confirming Beigel's tip regarding the marijuana grow operation to his satisfaction, Andrews and the other agents entered Petitioner's property through a cracked open walk-through gate in an attempt to make contact

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

with the residents of the house.    They rang the doorbell, knocked on the

door and walked around the back of the house, but no one answered.

Petitioner's wife,[1]  Josephine Burns, was inside the house with their six

year old son, and called 911, following which a deputy from the Alachua

County Sheriff's office was dispatched.    (ECF No. 91 at 70; ECF No. 144

at 57.)    In the presence of the deputy, Ms. Burns opened the door and

came out to speak with law enforcement.    Ms. Burns, who had already

called Petitioner, called him again, and Agent Andrews took the phone and

requested that Petitioner return home.    Law enforcement officers

positioned themselves along Petitioner's route home to observe his

approach and stop him just prior to his arrival.    Agent Andrews waited for

Petitioner along with Ms. Burns outside of the family's home.

When Petitioner arrived he was given a pat-down and Sgt. Kelly of

the Alachua County Sheriff's Office walked him up the drive towards the

house to meet Agent Andrews.    There, Andrews told Petitioner of the

information law enforcement had been given about what might be found on

---

[1] Ms. Burns is variously identified in the record as Petitioner's girlfriend, paramour, fiancée, and wife.   Because Petitioner identifies her as his wife in his motion, the court will refer to her as such henceforth.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

his property.   Andrews informed Petitioner that law enforcement had come out to the property in an attempt to try and enhance probable cause, which they had done from the exterior of the property, and that they now had enough to present to a court to apply for a search warrant.   Andrews advised Petitioner that he could cooperate and allow a consensual search or agents could apply for a warrant.   Before agreeing to continue to cooperate, Petitioner asked that agents take his child into consideration. When Agent Andrews agreed to try to minimize the child's exposure to law enforcement and vice versa, Petitioner signed the DEA Form 88, a consent to search form.   Petitioner then physically accompanied agents around the property, unlocking buildings on the premises and providing access to the marijuana and weapons giving rise to the charges in this case.   As noted above, Petitioner challenges both the agents' initial entry onto his property and the voluntariness of his consent.

## **ANALYSIS**

## **Timeliness and the Mandate Rule**

The Government first contends that Petitioner's claims are untimely and barred by the mandate rule. Title 28 U.S.C. § 2255(f) imposes a one-

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

year time limitation on the filing of motions under this section. Relevant to the Government's position, the one-year period of time runs from the date on which the judgment of conviction becomes final.   The Government asserts that Petitioner's conviction became final ninety days after his direct appeal, i.e., when the time for filing a petition for certiorari expired.   *See Clay v. United States*, 537 U.S. 522 (2003).   The Eleventh Circuit rendered its opinion on February 8, 2012 (ECF No. 122) and thus, to have been timely filed, his petition should have been filed within one year from that date.   Because the petition was not filed until October of 2013, the Government argues it was untimely.

In making this argument, the Government appears to take the position that because of the limited mandate, the one year "clock" did not restart upon resentencing.   Upon remand, the district court was tasked only with vacating the conviction on Count Two and resentencing Petitioner on Counts One, Four and Five after considering a properly calculated guideline range.   Pursuant to the mandate rule, a district court must limit its resentencing to issues contained within the limited mandate.   *See United States v. Rolon*, 511 F. App'x 883 (11th Cir. 2013) (citing *United*

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

*States v. Davis*, 329 F.3d 1250, 1252 (11th Cir. 2003) ( "If the appellate court issues a limited mandate, ... the trial court is restricted in the range of issues it may consider on remand"); *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir.1996) (explaining that under the mandate rule, which is an application of the law of the case doctrine, a district court properly limits its resentencing to consideration of the remanded issue). The Government's citation to *United States v. Rolon*, 511 F. App'x 883 (11th Cir. 2013) affirms only the proposition that a direct appeal after resentencing is limited to matters that were the subject of resentencing.   It does not speak to the issue of when the judgment of conviction becomes final for the purposes of AEDPA.

A judgment is based on both a conviction and a sentence, and therefore, it is the judgment on resentencing that triggers a federal limitations period.   *See Ferreira v. Sec'y Dep't of Corr.*, 494 F.3d 1286 (11th Cir. 2007); *see also Burton v. Stewart*, 549 U.S. 147, 156-157 (2007) (the AEDPA limitations period does not begin until both defendant's conviction and sentence became final).   The Government's position regarding the timeliness of Petitioner's motion ignores the possibility that

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

additional proceedings could stem from the limited mandate, such as a second appeal.   In such a circumstance, under the Government's scenario, Petitioner would have been required to file his § 2255 motion during the pendency of the appeal.   Conversely, absent a second appeal, if Petitioner were required to file the § 2255 motion on or before June 8, 2013, this leaves open the question about the deadline for pursuing constitutional claims that may have arisen out of the November 2012 resentencing.   Therefore, despite the fact that it was a limited remand, the best conclusion appears to be that Petitioner's conviction and sentence did not become final for AEDPA purposes until the expiration of the deadline for appealing the amended judgment, or November 29, 2012.   *Accord Pettiford v. United States*, Case Nos. 7:09cv90069, 7:04cr001, 2010 WL 2365688, at *3 (M.D. Ga. Apr. 2, 2010) (where defendant appealed after a limited remand, finding, without discussion, that the conviction became final after expiration of the time to seek certiorari review after the second appeal).   Thus, Petitioner's motion, which was filed within one year from that date, is timely.

## General Standard of Review for § 2255 Petitions

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.   A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.   *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n. 8 (11th Cir. 2011).   "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"   *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).   The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

The law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct

appeal.   *Rozier v. United States*, 701 F.3d 681, 684 (11th Cir. 2012);

*United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *Mills v.*

*United States*, 36 F.3d 1052, 1056 (11th Cir. 1994).   Once a matter has

been decided adversely to a defendant on direct appeal, it cannot be re-

litigated in a collateral attack under section 2255.   *Nyhuis*, 211 F.3d at

1343 (quotation omitted).   Broad discretion is afforded to a court's

determination of whether a particular claim has been previously raised.

*Sanders v. United States*, 373 U.S. 1, 16 (1963) ("identical grounds may

often be proved by different factual allegations . . . or supported by different

legal arguments . . . or couched in different language . . . or vary in

immaterial respects").

Furthermore, a motion to vacate under section 2255 is not a

substitute for direct appeal, and issues which could have been raised on

direct appeal are generally not actionable in a section 2255 motion and will

be considered procedurally barred.   *Lynn*, 365 F.3d at 1234–35; *Bousley*

*v. United States*, 523 U.S. 614, 621 (1998); *McKay v. United States*, 657

F.3d 1190, 1195 (11th Cir. 2011).   An issue is "'available' on direct appeal

when its merits can be reviewed without further factual development."

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

*Lynn*, 365 F.3d at 1232 n. 14 (quoting *Mills*, 36 F.3d at 1055).    Absent a

showing that the ground of error was unavailable on direct appeal, a court

may not consider the ground in a section 2255 motion unless the petitioner

establishes (1) cause for not raising the ground on direct appeal, and (2)

actual prejudice resulting from the alleged error, that is, alternatively, that

he is "actually innocent."    *Lynn*, 365 F.3d at 1234; *Bousley*, 523 U.S. at

622 (citations omitted).   To show cause for procedural default, a petitioner

must show that "some objective factor external to the defense prevented

[him] or his counsel from raising his claims on direct appeal and that this

factor cannot be fairly attributable to [petitioner's] own conduct."   *Lynn*,

365 F.3d at 1235.   A meritorious claim of ineffective assistance of counsel

can constitute cause.   *See Nyhuis*, 211 F.3d at 1344.

Ineffective assistance of counsel claims are generally not cognizable

on direct appeal and are properly raised by a § 2255 motion regardless of

whether they could have been brought on direct appeal.   *Massaro v.*

*United States*, 538 U.S. 500, 503 (2003); *see also United States v.*

*Franklin*, 694 F.3d, 1, 8 (11th Cir. 2012).   In order to prevail on a

constitutional claim of ineffective assistance of counsel, a petitioner must

demonstrate both that counsel's performance was below an objective and

reasonable professional norm and that he was prejudiced by this

inadequacy.    *Strickland v. Washington*, 466 U.S. 668, 686 (1984);

*Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Darden v. United States*, 708

F.3d 1225, 1228 (11th Cir. 2013).    In applying *Strickland*, the court may

dispose of an ineffective assistance claim if a petitioner fails to carry his

burden on either of the two prongs.    *Strickland*, 466 U.S. at 697; *Brown v.*

*United States*, 720 F.3d 1316, 1326 (11th Cir. 2013); *Holladay v. Haley*,

209 F.3d 1243, 1248 (11th Cir.2000) ("[T]he court need not address the

performance prong if the defendant cannot meet the prejudice prong, or

vice versa.").

When counsel's alleged ineffectiveness involves a failure to

competently litigate a Fourth Amendment claim, in order to demonstrate

actual prejudice, the petitioner must prove that his Fourth Amendment

claim is meritorious and that there is a reasonable probability that the

verdict would have been different absent the excludable evidence.

*Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986); *Zakrzewski v.*

*McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006).    Regardless of

whether guilt is established by the excludable evidence, the proper

question is whether the outcome of the proceedings would have been

different had the motion to suppress been filed and the evidence been

excluded.   *Jones v. United States*, 224 F.3d 1251, 1259 (11th Cir. 2000);

*Huynh v. King*, 95 F.3d 1052, 1058–59 (11th Cir. 1996); *Thomas v.*

*Newsome*, 821 F.2d 1550, 1552 (11th Cir. 1987); see also *Ward v. Dretke*,

420 F.3d 479, 488 (5th Cir. 2005).   Thus, the court must consider whether

either challenge Petitioner puts forth would have been successful.

## Petitioner's Fourth Amendment Claims

Petitioner contends that counsel should have raised two distinct, but

related, arguments under the Fourth Amendment.   First, he maintains that

counsel should have argued that law enforcement violated his rights under

the Fourth Amendment when they unlawfully entered the curtilage of his

home.   Second, he asserts that counsel should have challenged his

consent to the search as a product of the illegal entry and coercive tactics

by law enforcement.[2]

---

[2] Petitioner assails the defense strategy of attempting to implicate an additional party, despite the fact that this strategy was supported by his testimony at trial.   Furthermore, the question of a defense strategy would have been all but moot had a motion to

As discussed above, to prevail on an ineffective assistance of counsel claim involving an alleged fourth amendment violation, Petitioner must show that his claim is meritorious and that, regardless of whether guilt would have been established by the excludable evidence, the verdict would have been different without it.   *Kimmelman*, 477 U.S. at 375; *Zakrzewski*, 455 F.3d at 1260; *Jones*, 224 F.3d at 1259; *Huynh*, 95 F.3d at 1058–59. As such, the inquiry is highly fact intensive, and the recommendation will include a recitation of the facts as presented at trial and in the written record, as well as testimony adduced at the evidentiary hearing.

### Trial Testimony and Written Submissions

Although Petitioner testified at some length at trial, his testimony was not instructive as to the events of which he now complains.   He stated only that he "was working one moment and was called and told to come home because of all of this" such that his "whole world collapsed within a span of an hour," and that the agents told him to "tell [them] something" and they "would be easier on" him if he did.   (ECF No. 94 at 79-80).

---

suppress been successful.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Petitioner explained the events on the date in question in an affidavit in support of his motion, as well as a statement of facts in the accompanying memorandum.   (ECF No. 144 at 7-11, 58-61.)   Although the latter document is not separately sworn under penalty of perjury, it is incorporated into the sworn § 2255 motion, and as such the allegations contained therein are arguably acceptable as sworn as well.

Petitioner describes his property located at 15508 SW 149th Place in Archer Florida as "heavily wooded," and explains that he kept "No Trespassing" and "Beware of Dog" signs on his closed fencing to protect the privacy of his family and his home. Attached photos of his property support this description. (ECF No. 144 at 53-56.)[3]   Petitioner states that he received very few visitors to his home, and that any visitors were required to call in advance.   Petitioner notes that on July 14, 2008, after allegedly smelling marijuana growing on Petitioner's property, DEA agents and officers of the G.A.D.T.F entered the fenced, gated, posted curtilage of his home.   Petitioner's wife, Josephine Burns, called 911 out of fear for her

---

[3] The court notes that the pictures in the electronic record are difficult to discern, although the originals are quite clear.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

safety, and a deputy from the Alachua County Sheriff's office was dispatched to the premises.    While on the phone with the 911 operator and with the Alachua deputy on the scene, Ms. Burns opened the front door.    She and their six year old son were taken from the house and detained by law enforcement.    Agent Andrews ordered Ms. Burns to call Petitioner at work, and when she complied Andrews took possession of the phone and directed Petitioner to come home immediately.    Andrews informed Petitioner that his wife and son would be detained outside in front of the home until he did so, that they would not be free to leave, and that agents and officers were not leaving the property.

Petitioner complied with the instructions and drove home.    In the affidavit, he states that even as he was making his way home, law enforcement instructed his wife to call him again to ascertain his whereabouts and expected time of arrival.    As Petitioner approached his driveway, he stated that his vehicle was suddenly blocked by two unmarked law enforcement vehicles.    He saw multiple officers present with weapons drawn and pointed at him, including one with a submachine gun.    Petitioner was ordered to put his vehicle in park, put his hands in the

air, and exit his vehicle, which he did.    After being pat-frisked, he was

escorted by armed guard through his gate and towards his home where

Agent Andrews advised Petitioner of the reason he was on the property.

Petitioner saw, but was unable to speak to, his wife and son as they were

taken inside the house as Petitioner approached.

Petitioner describes Agent Andrews' questioning as "aggressive."

Andrews told Petitioner that he could do this "the easy way, or the hard

way," and that Petitioner needed to sign the consent form.    Andrews told

Petitioner in a loud voice that he was going to search the property either

way, and warned that if Andrews had to secure a warrant, Petitioner's wife

and son would have to sit on the front lawn until the warrant was secured,

even if that did not happen until the following day.    Petitioner interpreted

this to mean that the search would occur regardless of the choice he made,

but that the cost of refusing consent would be harm to his family.

Petitioner requested that Agent Andrews make an effort to limit his son's

exposure to law enforcement, and Andrews responded that he would do so

only if Petitioner signed the consent form.    Petitioner reiterates that he was

never told that he could leave, or that his family could leave, and Andrews told him that law enforcement was not leaving the property.

In light of the above, Petitioner was very concerned for the safety and well-being of his family, and admitted that he felt intimidated by Agent Andrews and the "large show of force"-- around a dozen officers -- occupying his property.   Petitioner makes special note of the fact that he signed the consent form less than ten minutes from the time officers had stopped him on the roadway in front of his property.   Once he signed the consent form, Andrews told him that he needed to unlock the trailer, safe, and other locks on his property for the officers.   After this occurred and incriminating evidence was uncovered, Andrews read Petitioner his *Miranda* rights and placed him under arrest.

Petitioner now contends that he explained the events on the date of his arrest to his attorney, and that counsel originally told him that he would file a motion to suppress.   At some point, however, counsel changed his mind and told Petitioner that he could not pursue a motion to suppress because Petitioner had signed a consent form.   Petitioner contends that counsel's change of heart occurred without him first investigating the facts,

laws, and alleged constitutional violations surrounding the case.    It was this decision that Petitioner now maintains was constitutionally deficient.

Defense counsel Stephen Bernstein submitted an affidavit in response to Petitioner's motion.    (ECF No. 146-2.)    In the affidavit, Mr. Bernstein relates that law enforcement detected the odor of marijuana growing on Petitioner's property from adjacent land, and, based on this information, they approached the residence to make inquiry, taking precautions for officer and public safety.    According to the affidavit, Ms. Burns facilitated Special Agent Andrews' contact with Petitioner, and Petitioner told Andrews that "he was willing to cooperate, that he was responsible for the grow operation and not his girlfriend."

Attorney Bernstein further states that when Petitioner arrived at his property, he "gave consent to search, unlocked the doors and gave agents a tour of the operations."    (ECF No. 146-2 at 1.)    In light of this, counsel concluded that a motion to suppress the fruits of the search of the premises was unsupported, as there was no good faith basis to suggest that consent had been given under threat, pressure, or duress to the extent that it was involuntary.    It appears from the affidavit that Petitioner requested that Mr.

Bernstein file a motion to suppress, but counsel's assessment was that his client's actions "seemed to be deliberate and designed to facilitate an understanding of cooperation and willingness to implicate others."   (ECF No. 146-2 at 2.)

Finally, counsel observes that the officers involved in this investigation had conducted similar operations in this district.[4]   Counsel emphasized that he did not simply discount his client's Fourth Amendment concerns, but he hired a former retired narcotics officer as an investigator to specifically review law enforcement procedures, in addition to performing other investigations in support of his client's defense.   It was after review of the facts in the case that counsel concluded that there was not a "good factual basis to make the challenge of involuntary consent waiver."   (ECF No. 146-2 at 2.)

---

[4] The day after the jury's verdict in Petitioner's case, Judge Mickle, who presided over Petitioner's trial, conducted a hearing on a motion to suppress the fruits of a search involving not only the same agents, but a very similar fact pattern.   *United States v. Hambelton*, Case No. 1:08cr26/SPM.   Petitioner relies heavily on Hambelton, in which, as will be discussed in detail below, the fruits of that search were suppressed.   *See United States v. Hambelton*, Case 1:08cr26/SPM, 2009 WL 722284 (N.D. Fla. Mar. 18, 2009).

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

The basis for counsel's statement regarding Petitioner's telephonic admission to his involvement in the grow operation is not clear from the record.   Special Agent Andrews did not specifically mention Petitioner's alleged willingness to cooperate in his direct testimony at trial about the telephone conversation, although he stated that from the time Andrews met Petitioner, "he was very cooperative, wanted to cooperate on the whole operation."   (*See*, ECF No. 91 at 71-72; ECF No. 146-2 at 1.)   Andrews stated on cross that "from the immediate time I made contact with [Petitioner], he represented he wanted to cooperate with me."   (ECF No. 93 at 11.)   Additionally, counsel's reference to his client's "willingness to implicate others" during his initial encounter with law enforcement is somewhat confusing, as Agent Andrews testified that Petitioner never mentioned or implicated another party, even though Andrews himself already knew that the confidential source, David Beigel, had been involved in the grow operation.

Petitioner made a lengthy statement at sentencing which, although not sworn under penalty of perjury, is also relevant.   (ECF No. 95 at 7-17.) In this statement, he expressed both his remorse about his involvement in

the offense conduct as well as his dissatisfaction with various aspects of

his case.    (ECF No. 95 at 7-17.)    For instance, Petitioner complained of

false testimony at trial, disputing agents' testimony regarding whether they

draw their weapons at him when he drove up, and noting that their actions

made him nervous and afraid of them.    He alluded to both of the alleged

Fourth Amendment violations he raises in the instant motion.    He pointed

out the fact that his gate had signs warning against trespassing and of the

dog, and disputed agents' testimony that the gate had been cracked open.

Petitioner insisted that the gate was secured by a bungee cord, although he

was not there at the time law enforcement entered.    He reminded the court

that agents came onto his property without either consent or a warrant,

prompting Ms. Burns to call 911 and report that there was a group of men

running around on the property with guns.    Petitioner also said that the

DEA "coerced" him to sign the consent to search because Andrews told

him that if he signed, they would "go easy on" him, whereas if he did not,

Ms. Burns and their six year old son would be held out in the front yard until

the next day when agents secured a search warrant.    (ECF No. 95 at 15.)

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

## Evidentiary Hearing

Because the Court concluded that the affidavit testimony was conflicting, the Court held an evidentiary hearing during which Petitioner, Attorney Bernstein and Agent Andrews testified.

Petitioner's former trial counsel, Steven Nathan Bernstein, testified that in preparation for his appearance at the evidentiary hearing, he had met with Assistant United States Attorney Greg McMahon at McMahon's office, looked over the affidavit he prepared previously, reviewed Mr. Treffinger's complaint and read some of the trial transcript.   He recalled that he reviewed notes in order to prepare the affidavit, but testified that he did not re-review notes before this hearing.   Mr. Bernstein brought a file containing notes and correspondence related to his representation of Petitioner, but he stated that he was unsure whether he had retained everything, because he thought the matter had been resolved when he submitted the affidavit.

Mr. Bernstein recalled that Treffinger had another attorney before he contacted Bernstein, and that Bernstein was not retained until after he spoke with Treffinger twice at the jail. Mr. Bernstein related that after he

was retained, he reviewed discovery and talked to anyone Treffinger
suggested that he should contact.   Mr. Bernstein also hired a private
investigator, Mike Thompson, a former Sheriff's department employee with
experience in local narcotics cases, who knew local law enforcement
officers and had good credibility with them.

Mr. Bernstein testified that he quickly became aware that there was
"serious separation" between the facts that Petitioner had relayed to him
and what was in the discovery, as far as law enforcement actions and what
kind of pressure was placed on Petitioner at the scene.   He also noted that
that there was a discrepancy between what he had experienced in "knock
and talk" cases and his client's understanding of his Fourth Amendment
rights.

Mr. Bernstein recalled that Petitioner was the one who initiated the
conversation about filing a motion to suppress. After reviewing the
circumstances of the case, counsel told Petitioner that he did not think a
motion to suppress was warranted.    Petitioner told Mr. Bernstein that he
was under duress at the time he signed the form because law enforcement
had guns displayed and "in his face," and that officers told him if he did not

consent they would keep his family either out of the house, or in detention, or press charges against them.    Mr. Bernstein recalled Petitioner telling him that he returned home, upon the request of law enforcement, to cooperate.    Counsel noted, however, that despite a stated intent to cooperate, Petitioner gave law enforcement less than truthful information in that he protected his friend David Beigel, who, unbeknownst to Petitioner at the time, was the individual who had contacted law enforcement about Petitioner and his involvement in the grow operation.

Counsel explained that the he viewed the "disconnect" between Petitioner's recollection or perception and law enforcement's version of events as a task for the investigator to sort out.    For this reason, counsel wanted Mike Thompson to try to get backdoor or informal information about how things transpired.    Counsel hoped this would be more fruitful, since the AUSA would have necessarily been present any time counsel talked to law enforcement.    Bernstein recalled that Thompson also reviewed law enforcement practices in this search, and went to the scene to inspect where things happened.    Counsel said that he wanted Thompson to rely on his training and experience to assess whether there was anything

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

untoward in how law enforcement conducted itself in this case.    Mr.

Bernstein said that he also asked investigator Thompson to focus on the

RV where a lot of the evidence was located to be sure the sale had been

consummated, and Petitioner was not the purchaser.    Ultimately counsel

was unable to get the sellers of the RV subpoenaed for trial.

Mr. Bernstein testified that in cases such as this one involving a

"knock and talk," it is important to ensure that law enforcement is

conducting a good faith investigation and it is not that "something else is

going on."    He appeared satisfied with this aspect of the case.    Other

considerations he took into account were the location of the boundary of

the curtilage and what law enforcement had done in breaching that

boundary.    Counsel said that he looked at the four factors in *United States

v. Dunn*[5] which assist in the analysis of defining a home's curtilage:    the

proximity to the house itself; whether the area of curtilage is in an enclosure

surrounding the house; the nature of the uses to which the area is put; and

steps taken by the resident to protect the area from observation by the

public.    Mr. Bernstein said he had seen photographs of the property as

---

[5]  *United States v. Dunn*, 480 U.S. 294 (1987)

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

part of the discovery but that he neither personally went out to the property nor requested that Investigator Thompson take photos.

Counsel testified that his recollection was that the homestead portion of the property was fenced off separately from the entire parcel.    He acknowledged that one of the important issues he considered was whether the gate was ajar or closed.    When asked how he resolved that issue, counsel said that he did not resolve it, noting that a large part of the difficulty was that Petitioner's version of facts and law enforcement's version of facts were vastly different.    He later testified that the fact that the gate had been ajar was either in the application for search warrant or in initial discovery reports.    When the court asked him at the conclusion of questioning whether he recalled anything on the front gate to secure it, counsel responded that he did not recall a padlock, and that there was a way to secure the front gate, although it was not secured.

Another of counsel's concerns was that he had been told that the informant had given law enforcement information causing concern about Petitioner's behavior, i.e. insinuations of domestic violence and threatening behavior toward the informant.    Counsel was concerned about risking

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

getting into the "nasty facts" about Petitioner's behavior.    He did not want

to open the door to this information coming out in the litigation of pre-trial

motions.

Counsel also noted that his conversation with Ms. Burns was not

instructive.    Ms. Burns told him that she called 911 about armed men on

their property, and that she was on the phone with the 911 dispatcher when

she opened the door to law enforcement.    She offered no information that

corroborated the pressure the Petitioner reportedly felt.    She did not say

the same things that Petitioner did, and she did not have the vantage point

to see the same thing the Petitioner did.    With respect to Petitioner's

alleged violence, counsel said he asked Ms. Burns if Petitioner had been

violent and "her answer was not very succinct but she basically denied it."

Mr. Bernstein testified that he was well aware that there had been a

number of marijuana grow cases prosecuted around the same time in the

Northern District of Florida, noting that he had been retained in another

such case, *United States v. William J. Erickson*, 1:08cr10/RV/GRJ.    In the

*Erickson* case, Bernstein reported that he filed a motion to suppress

evidence on August 25, 2008 to suppress evidence obtained as a result of

a search involving some of the same players, including Agent Andrews.

(Case No. 1:08cr10/SPM, ECF Nos. 108-110.)   Counsel recalled that in

that case after receiving information about a grow operation, law

enforcement followed some tire tracks and ended up on his client's

property where they were able to observe signs of the marijuana grow

operation in plain view.   Defendant Erickson did not consent to a search,

and law enforcement maintained the property for several hours until they

obtained a warrant.   Counsel noted that he retained an investigator and

inspected the property before filing the motion to suppress, in which he

argued that officers had unlawfully entered the curtilage of the property.

Counsel conceded that his challenge to the warrant was unsuccessful both

at the trial court level and on appeal.   *See* Case No. 1:08cr10/SPM, ECF

No.124; *United States v. Cha*, 431 F. App'x 790 (11th Cir. 2011).   He

could not recall if he had spoken to any colleagues about the motion at the

time, such as Larry Turner.   He also did not recall whether he had

reviewed the circumstances of the *Hambelton* case, although he later noted

that the suppression hearing in that case was held after his client's trial and

conviction.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Counsel was asked whether there was any possibility of a plea bargain, or whether Petitioner always intended to go to trial.    Counsel explained that they had done the Rule 11 proffer, so there was some hope for a plea bargain that would shield Petitioner from the high sentences he was facing in the indictment.    Of course, as this court is well aware, a plea "bargain" in the Northern District of Florida is unlikely.    Counsel said that at one point Treffinger thought he could give the Government some information on Mr. Beigel, but since Beigel was already "in the Government's camp," there was little Petitioner could have offered that would be of benefit to him, other than information on where the marijuana was sold.

In any event, Petitioner's attempts at cooperation were relatively early in the proceedings, and the Government did not feel like the information Petitioner could offer was "big" or reliable enough to help them pursue another big case.    As a result, Bernstein and Treffinger decided that the case would go to trial.    Once this decision had been made, counsel focused on how his client would appear and how he would present him at trial.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

In sum, Mr. Bernstein's reasons for not filing a motion to suppress included the fact that law enforcement had permission to enter the neighbor's property from where they could smell marijuana and hear the hum from the ballasts moving in the grow operation. In his opinion, law enforcement had enough information to conduct a knock and talk. According to Bernstein, in view of the downside of what could happen if Treffinger filed the motion to suppress, he did not want to file the motion to suppress without a reasonable possibility of prevailing, because he did not want to put Petitioner's credibility at issue before trial.   Still, he conceded that he could have established curtilage through the Government's photographs without Petitioner testifying or that he could have limited the scope of questioning to the issue of whether Petitioner felt duress to consent, and how he maintained his property with regard to privacy.

On cross-examination, Mr. Bernstein was presented with certain discovery materials that had been marked as exhibits. Government's exhibit 2 was the affidavit and application for a search warrant, which references Mr. Beigel as the source of information.   From this exhibit, it was obvious that the law enforcement officer knew about the grow

operation, the guns and bombs on the premises, Treffinger's alleged

violence towards Ms. Burns and their son, and his paranoia.

Government's Exhibit 1 was a copy of the standard discovery letter,

and included a short summary of Mr. Treffinger's statements.   The exhibit

mentions a DVD recording of the search and plant count.   Mr. Bernstein

testified that, in his experience, the DVD was very unique. The DVD depicts

Mr. Treffinger with law enforcement during the course of the search, and in

counsel's opinion, acting essentially as a "tour guide." The DVD depicts

Petitioner explaining to officers what happened in different areas of the

property, alerting them to watch out for certain things, and noting the

location of certain items.   In Mr. Bernstein's opinion, based upon the

manner in which Petitioner explained the property and the grow operation

to law enforcement on the video, the Petitioner appeared to be fully

engaged and cooperating, and very comfortable with the officers.     Mr.

Bernstein testified that Petitioner's relaxed demeanor in the DVD factored

into his decision regarding the motion to suppress.[6]

---

[6] At this juncture in the hearing, the Government noted that it was uncertain whether the
DVD was still in existence.   The undersigned agreed to leave the evidentiary hearing
open for a short time for the parties to review and, if necessary, introduce the DVD and

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Counsel also reiterated that Petitioner's Rule 11 proffer was a factor on some level.   Remaining hope that Petitioner would be able to cooperate with law enforcement weighed against filing the motion.

Another consideration identified by counsel for not filing a motion to suppress was that the documents Petitioner signed giving consent for the search addressed the issues of force and coercion.   Although the forms identified as Defense Exhibits 1 and 2 did not reflect that refusal to cooperate is an option, counsel testified that the fact Treffinger had initialed and signed the consent forms in each place would work against any argument that he had been "coerced" to sign the documents.

Finally, Counsel reiterated his concern about placing his client's credibility at issue before trial in light of the "serious separation" between

---

additional testimony about its contents.   After the hearing, the parties submitted a joint stipulation advising that the DVD in question, which had been Government's Trial Exhibit 2 from Petitioner's trial, had been located during the evidentiary hearing.   After review, they stipulated that this DVD had previously been provided to defense counsel as part of the discovery for the evidentiary hearing, and represented that the Government would file the DVD with the court if the court deemed review thereof necessary to make an informed decision of the issues raised in Petitioner's motion. (ECF No. 165.)   As neither party has moved for the introduction of the DVD, either to contradict or support's Mr. Bernstein's testimony, the court will rely on the testimony of counsel as being fairly representative of the contents of the DVD.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

the facts as relayed by Petitioner and what was learned in discovery.

Because Mr. Bernstein expected Petitioner to be the main defense witness

at trial, he concluded that putting Petitioner into a testimonial situation

ahead of time would not be advisable. Mr. Bernstein explained that in his

view greater the number of times he testified, the greater the potential for

impeachment. Bernstein noted that, in hindsight, the Rule 11 proffer

demonstrated that risk. Although the Rule 11 proffer was not used against

Petitioner in the case in chief, it was used during cross-examination to

impeach him based on differences between Petitioner's statements during

the Rule 11 proffer and Petitioner's trial testimony.    If Petitioner had

provided testimony on an additional occasion, Bernstein believed there was

an increased risk of Treffinger providing inconsistent statements that could

be used as impeachment. This was of particular concern to Bernstein

because Bernstein already knew that law enforcement's version of events

was virtually opposite of what Petitioner would say and Petitioner's

credibility was critical to the defense position that Mr. Beigel was

responsible for everything.

Counsel was asked about Petitioner's statement in his 2255 motion "if I had known that they knew about Beigel, it would have changed what I said."   Mr. Bernstein pointed out that this statement reflected the possibility that Treffinger would engage in an "evolving narrative" thus evidencing the danger of putting a witness like that on the stand. According to Bernstein, Treffinger's statement reflects an individual who is not guided by the truth but rather is guided by what can benefit him. There is no record evidence that counsel knew, prior to deciding not to file the motion to suppress, of Petitioner's position that had he known that law enforcement knew about Beigel's involvement he would have changed his story.   Thus, this statement serves only as after the fact corroboration of counsel's credibility concerns.

In sum, counsel concluded that his investigation, including information obtained by investigator Thompson, never revealed any independent evidence that would have corroborated Petitioner's assertion that he was coerced into signing the consent form, such as guns pointed at him or his family being threatened.   To the contrary, based on his investigation, counsel described Petitioner's attitude as akin to "I'm going to

do whatever I can to cooperate with you guys."    As such, it was counsel's

professional judgment not to file a motion to suppress where both the

chance of success was small and also where there was the possibility that

filing the motion could have undermined counsel's ability to take the case to

trial.

Investigator Mike Thompson also testified at the evidentiary hearing.

He described himself as a licensed private investigator in Florida, retired

from the Alachua County Sheriff's Office, and appeared well-credentialed

with a diverse practice in many kinds of cases.    Mr. Thompson testified

that he does no advertising, but just gets called as needed.

Thompson first met with Mr. Bernstein on September 3, 2008.

Bernstein was familiar with Thompson through past experience and knew

that Thompson had been part of drug task force.    After Mr. Thompson's

appointment was approved by the court two days later, he met with counsel

again and received a copy of the discovery so he could begin his

investigation.    Thompson interviewed Petitioner at the jail, reviewed the

discovery, and followed up on leads and threads he identified through the

discovery packet.    Mr. Thompson said that during his investigation he

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

questioned whether the law enforcement officers could have smelled the marijuana from the adjacent property because it was a large parcel.    He relayed his concern to Mr. Bernstein, but testified that he did not receive any further instruction.    When asked whether counsel had talked to him about a suppression motion, Thompson responded that a defense attorney has never asked such a thing.    He writes the report and is "just the investigator."    He reported that he is not involved in any defense decisions, explaining that he makes factual findings, but does not do legal analysis.    Mr. Thompson's investigative report was introduced as Petitioner's exhibit 3 at the hearing.

On cross examination Thompson described marijuana as having a "pungent" odor that can be smelled from various distances.    He indicated that he had experienced smelling marijuana from some distance during his time as a deputy.    Thompson noted that in addition to the 267 plants that were discovered, there were ballasts and hydroponics involved in the grow operation.    Thompson saw photos of the plants that had been recovered which confirmed that the marijuana was at various stages of growth.    He described the mobile home as being ten to fifteen yards away from the

edge of the property, and well away from Petitioner's residence.

Thompson did not recall a specific request to investigate whether the gates were locked or open at the time law enforcement first arrived on the premises.    He said that he would have to read his notes from his interview with Treffinger to see whether such a statement was made, and he did not recall what Petitioner's wife may have said.    Thompson noted that Petitioner had told him he had disposed of a firearm and some marijuana on his way back to the house on the date of the search.

Petitioner's spouse, Josephine Burns also testified at the hearing. Ms. Burns' indicated that her native language is Filipino, but she is comfortable with English.    She works at UWF as a program assistant and has been in a relationship with Petitioner since 2000.    She and Treffinger had a son in July of 2001.    Although she has since moved, in July of 2008 the family was living in rural Archer Florida, on five acres of property that she described as gated and fenced and was posted with "no trespassing" and "beware of dog" signs.    She explained that the house was near the front of the property and the trailers were near the back, partially obstructed from view by trees.    Ms. Burns testified that the gate was always shut

because they did not want the dog to get out, and if they had company coming, she would open the gate for them.

Ms. Burns said that on July 14, 2008, she heard the dog bark and she went near the door of her residence.   She said that she heard the doorbell ring and she heard banging on the door and she "freaked out" when she looked out the window and saw men outside the front gate.   She again said that they never leave the gate open.   Ms. Burns thought that she was being robbed, so she was very nervous and shaking.   She put her son in his room and called 911 to report the presence of the unknown men and her fear of being robbed.   She said she looked out the master bedroom window and saw the three men, one of whom had a long gun, and she told the dispatcher she was going to die.   Ms. Burns called Petitioner as well, and told him that she thought she was being robbed.   He allegedly told her to give the men what they wanted and that he would be home soon.   Ms. Burns said that she was talking to both the 911 dispatcher and her husband when a marked police car came.   She said that she thought the men should be gone when the police arrived, and it was not until she came out of the house that she saw the "DEA" lettering on their shirts.   Ms. Burns

recalled that once she left the house she was not allowed back in until Petitioner arrived home, which she described as "maybe a few hours." After Petitioner was arrested, someone else hired Mr. Bernstein for him. Ms. Burns talked to Mr. Bernstein to get a power of attorney that Petitioner signed, but she did not recall counsel asking her any questions about the case.

On cross-examination Ms. Burns reiterated that she did not see the "DEA" logo on the agents' shirts until after she was out of the house. When she had seen them on the property, the only thing she paid attention to was the rifle. She indicated that, when the officers asked her, she told them that there were guns in the closet, but she denied knowing about other guns in the home, including under the bed. She did not recall that agents told her that the guns in the house were the reason she could not re-enter the premises.

Ms. Burns indicated that she saw Petitioner accompany law enforcement agents around the property, although she was not close enough to observe exactly what transpired.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Ms. Burns testified that she visited Petitioner in jail, but he never told her about the marijuana, the bombs, laser scope, or silencer he had on the property.   She explained that Petitioner had been upset when a band of pit bulls had killed one of their cats, but he did not tell her that he was going to keep a gun to shoot the dogs if they returned.   Ms. Burns denied knowing that 39 guns were recovered.

Petitioner Treffinger testified next.   He stated that he purchased the property in question in August of 1989.   He enclosed it with a sturdy fence with barbed wire and installed gated entrances.   In addition to the fence, he maintained trees along the fence line to keep an area of privacy from his few neighbors.   In 2008, Petitioner testified that he had surveillance beams, motion detectors, a guard dog, and signs advising "no trespassing" and "beware of dog."   His family's mailbox was 150 yards away from the property, UPS and FedEx would wrap packages in plastic and leave them at the gate, and visitors would call first.

Petitioner testified that every morning when he went to work he would keep the gate locked.   He had an outdoor dog with a dog house, but the dog would leave the property if the gate was open.   He explained that this

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

dog, and others they had before it, would not listen to Ms. Burns and would roam if the gate was open.

On July 14, 2008, Petitioner recalled that while he was at work, Ms. Burns called him, very frantic.    From what she told him, he believed that she or their son was in imminent danger, perhaps from a home invasion. He started home from Ocala, where he was working at the time.    During the ride home, Ms. Burns called him again and then a male voice came on the phone.    The man, Agent Andrews, told Petitioner that law enforcement was on the property to investigate a marijuana grow operation, and that his wife and son were not free to leave until he arrived.    He told Agent Andrews he was on the way home already.    Petitioner estimated that it was 45 minutes from that phone call until he got home.    About two miles from the property Petitioner noticed a black suburban truck that started following him, and about a half mile from his property a second truck appeared, and once he neared the mail box another one pulled in directly behind him, close to his bumper.    As he rounded the corner near the property, another police car backed up to his front bumper, so he was blocked in.    Petitioner said that the driver in front of him came out of his

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

vehicle with an MP5 machine gun pointed at him, right up to the windshield of his car.   Petitioner estimated that there were four or five cars around the property.   He said that people had hand guns drawn or exposed, and they were barking orders to put his hands up, so he put his hands up and got out of car.

Law enforcement patted him down and started walking him up to the gate of his property, which was open.   Petitioner said the two men who had been by the side of the car waited by the gate, and another officer placed his weapon in the trunk of his car.   Petitioner estimated that it was approximately 40 yards from where he was stopped to the house.   One of the officers walked him to within ten feet of the house, where Agent Andrews, Agent Devinney and another officer were waiting. Petitioner estimated that there were more than ten law enforcement officers around his house, and everyone had their side arms holstered.

The agents told him that they were there to investigate a tip about a marijuana grow operation and they needed him to cooperate and sign a consent.   When asked whether he felt like he was free to go, Petitioner said that he did not, although agents did not express this to him.   He

explained that the reason he came home is because he had been told that Ms. Burns and his son were not free to leave until he arrived, and once he did, they were taken into the house with another agent.

At this point, Petitioner testified that he started to question whether they had a warrant.   Agent Andrews told him that they did not, and that they needed him to consent to the search, explaining that they "could do this the easy way or the hard way."   Petitioner testified that he understood that if he consented, they would "go easy on" him and his family and the house.   Otherwise, he feared that his wife and son might be detained all night outside the premises until they got the warrant.   In response to a question about the agents' demeanor, Petitioner said "Their mind was set." He said that their demeanor was forceful, but it was better than having a gun stuck in his face.   Petitioner stated that although the agents' demeanor changed when he asked about the warrant, he did not observe anyone "messing with" their weapons, although Agent Devinney's weapon was slung over his chest, ready to engage if necessary

Petitioner admitted that he signed the consent forms provided to him on the date of the search.   Petitioner reviewed Defense Exhibits 1 and 2,

the two blank forms, but said that they did not seem familiar, and he did not think these were the same two forms that he signed.    Petitioner testified that no one read the forms to him, and that he read them over briefly although his mind was racing 1000 miles per hour at the time.    He estimated that only seven or eight minutes had elapsed from the time he stopped at the gate to when he signed the form.    He said that he felt that he really had no option other than consenting because his family was threatened and he wanted to keep his son out of it.    Agent Andrews assured Petitioner that if he continued to cooperate they would limit his son's exposure to law enforcement.

Petitioner testified that if agents had called him and asked him to come home so they could investigate something of this nature, had his family not been there, he would not have complied.    He reiterated that he had come home for his family, and signed the consent form for his family.

Petitioner was asked how Mr. Bernstein came to represent him. Petitioner explained that he did not shop around, but that he selected Bernstein because he had sat on a jury in a trial that Bernstein tried and he thought Bernstein did a pretty good job.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Petitioner recalled that he and Bernstein had met about four times in seven months to discuss his situation.   Petitioner said that when he first met Mr. Bernstein he told him the facts of the case and within a week counsel was talking about filing a motion to suppress.   Petitioner said that he did not know much about the Fourth Amendment, but he just knew that the situation "was not right."   Petitioner recalled that counsel did not talk about the possible breach of the curtilage at the time, but that he focused on the coerciveness element.   Petitioner did not recall any reference to "knock and talk," and testified that he assumed the motion would be based on the totality of the circumstances.   Petitioner said that counsel had not asked to visit the property or for the names of potential witnesses.

Petitioner explained that Mr. Bernstein visited him in jail and told him that there was no plea offer, and that counsel could not file a motion to suppress because Petitioner had consented to the search.   Petitioner reminded counsel that he had been told Petitioner signed a consent form from the first day he was retained, and asked what had changed. Petitioner, who admittedly was not well-versed in Fourth Amendment law at the time, said that he did not understand counsel's explanation, and that he

was bewildered as to why no motion to suppress was filed.    During the next few meetings or conversations, even as they prepared for trial, Petitioner recalled that he reiterated to counsel his belief that a motion to suppress would be viable.

Once it became clear that counsel would not be filing a motion to suppress, they focused on the trial strategy of trying to implicate the confidential source.    The idea was to prove that Petitioner was not a key player in the operation because he did not have time, that the weapons were part of collections, rather than there to protect the marijuana, and that Mr. Beigel, not Petitioner, owned the camper housing the grow operation. Petitioner identified witnesses he thought counsel should talk to, and he noted that Mr. Thompson had located the people who sold the camper to Mr. Beigel and he was expecting them to appear at trial.    When they did not appear and he inquired with counsel, Bernstein brushed him off and responded that he did not know where the people were and that they needed to go with what they had.

On cross-examination, Petitioner was asked about the consent form he had signed, which was introduced as Government's exhibit 3.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Petitioner acknowledged that he had both signed the form and separately initialed provisions reading "I have not been threatened nor forced in any way" and "I freely consent to the search."   Petitioner admitted what the form said, but claimed that he had no choice.

Petitioner also admitted that he had smoked marijuana on the date of the search.   He told investigator Thompson that he had smoked "a couple of bowls" while he was completing paperwork from his day's activities, and that he had discarded a firearm and a small amount of cannabis on the way home.   Petitioner told Thompson that the marijuana was "good stuff" and that it would last six to eight hours.   Neither party made an issue of Petitioner's marijuana use or tried to suggest that it influenced the events of July 14, 2008.

Petitioner admitted that at the time of the search, when he was purportedly cooperating, that he lied to law enforcement in telling them that he was responsible for the marijuana grow, and that he had the guns, the explosives and the silencer.   He explained that he was trying to protect his friend and said that he was doing everything he could to appease the agents at that point.   He acknowledged his trial testimony that he had told

agents he was trying to be one hundred percent cooperative.   (*See* ECF

No. 94 at 119.)   Despite his professed willingness to cooperate, Petitioner

insisted that he was "ordered" to open doors around the property.[7]   He

said that he told the agents about the guns on the property in the spirit of

cooperation, but he did not mention the explosives or "firecrackers" until

they found them.   He explained how he had made them, how they were

used—throwing or being lit, although at trial he had assigned the blame for

these items to Beigel.   In response to the court's question, Petitioner

acknowledged that he knew there was a video taken of him walking agents

around the property.

DEA Special Agent Wayne Andrews was the last witness to testify.

Agent Andrews, for the past ten or fifteen years, has somewhat specialized

in marijuana.   Initially it was Beigel who came to law enforcement's

attention because he was buying growing supplies and taking them to

Petitioner's property.   Deputy Corey Hanson of the Alachua County

Sheriff's Office and Agent Devinney from the DEA met with Beigel, who

---

[7] The veracity of this could presumably be verified by the recorded version of events which the parties have not chosen to make part of the record.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

then told them about Petitioner's activities.   When they asked Beigel why he had wanted to speak to law enforcement, Beigel said he was nervous about the paranoia and violence that Petitioner was exhibiting.   Beigel claimed that Petitioner had beaten up Ms. Burns as well as himself. Beigel described Petitioner's property as set up with guns, surveillance, and explosives designed to help him defend his residence and he identified where on the property law enforcement would find the marijuana plants.

Special Agent Andrews explained that at that time, based only on Mr. Beigel's information, they could not have applied for a search warrant.   It was not until they traversed the adjacent property and developed the information by observing Petitioner's property, hearing the sounds of the ballast and smelling marijuana that he believed they had adequate basis for a search warrant, or at a minimum to make contact with the residents.   At that point they notified Deputy Hanson, who was the affiant for the search warrant for the property.

Agent Andrews indicated that law enforcement decided to approach the property because they observed Petitioner's car was not present. Beigel had warned them that a hostile situation, possibly a shooting, was

likely to develop if Petitioner was present, so they decided to attempt a

"knock and talk" out of safety considerations.    Agent Andrews, along with

Agents Devinny and Merritt entered the property dressed in body armor

that said "POLICE" on the front and "DEA" on the back.    They were

armed, and Andrews recalled that Devinny had both a side arm and a

weapon in a holster across his chest.    They entered the property through a

gate that he described as the size that a vehicle could pass through, not a

pedestrian gate.    Andrews stated emphatically that if the gate had been

locked and closed, he would not have done it that way, but would have

secured a warrant.    He agreed on cross-examination, however, that the

fact that the gate was open was not the dispositive factor of whether the

person had a reasonable expectation of privacy.    Nonetheless he noted

that in light of the fact that the information provided by the confidential

source seemed to be accurate, Petitioner was not there, a battered female

was believed to be in the residence, and the gate was open, it seemed to

be a good decision.

Agent Andrews testified that although Petitioner's vehicle was not at

the residence they knew that someone was inside.    The agents observed

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

the blinds on the windows oscillating, and in light of the intelligence

provided by Beigel regarding the weapons, this was of concern to them.

Two agents approached the front door and they could hear movement

inside.   When there was no answer at the door, they took cover.

Andrews stated that the dog never came into play, that it never barked or

anything.   Shortly thereafter they learned via radio that there was a 911

call coming from inside the house.   Ms. Burns was on the phone with

dispatch and she eventually came to the door and outside.   Andrews

explained that if Ms. Burns had not eventually come to the door, they likely

would have stepped away from the residence and waited to make contact

with Petitioner while drafting a warrant.   He recalled that after her initial

contact with law enforcement, Ms. Burns attempted to reenter the premises

to call to her son.   She was prevented from doing so, and Andrews

advised her that they would have to secure the weapons before they let her

go back in, but Ms. Burns did not consent for them to enter the house.

Andrews said that initially Ms. Burns did not seem to want law enforcement

on the property, but that at his request she called Petitioner, and Andrews

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

talked to him, explaining why they were there and requested that he come
to the house.

Special Agent Andrews described Petitioner's demeanor upon his
arrival to the property as personable and not hostile to agents.    Before
Petitioner consented to the search, Andrews explained to him the evidence
law enforcement had, and that it would be enough to secure a warrant.
Andrews told Petitioner that due to the weapons in the house, no one could
go back inside until the residence was secured.    He recalled that
Petitioner immediately wanted to cooperate from when Andrews had
contact with him, although he wanted to know who had "given him up."
Agent Andrews testified that the DEA Miranda form and the DEA 88
(consent form) were read to Petitioner, and he also had the opportunity to
read the form, and initial each line.    At the time, Petitioner said he
understood his rights and he agreed to speak to law enforcement.
Andrews denied having said that Petitioner's wife would be arrested if
Petitioner did not consent.    Andrews agreed that Petitioner was not free to
go at that time.

When asked whether Petitioner was under the influence, Andrews responded that he did not seem to be.   Andrews described Petitioner as respectful, not paranoid, said that he did not smell like marijuana or have bloodshot eyes.   To the best of his recollection, the agents did not find marijuana when they dug up the firearm that Petitioner had discarded on his way home.

After the consent form was signed, Agent Andrews did a walk through the entire property and found items of interest, so he asked Petitioner to walk them through the property to make sure no one got hurt.   Petitioner retrieved his keys and accompanied law enforcement through the various structures on the property.   Andrews said that Petitioner volunteered what they would find in the various places before they entered. They located several guns and pipe bombs in the double-wide, single-wide and 5th wheel trailers before going back to the main residence.   Treffinger told them about the weapons he had there and opened the door to the gun safe which contained pipe bombs.   Law enforcement found at least one gun silencer, numerous pipe bombs and tens of thousands of rounds of ammunition.   There were "bunkers" dug into the property and "shields"

made of 4 foot by 8 foot pieces of a Kevlar-like material as well as clothing with some of this sewn into it.   Agent Andrews related that once ATF agents arrived and saw the items that were discovered at the property, the Alachua Sheriff's Office bomb unit was called to the scene.   They in turn asked everyone to leave because of the possible danger from the explosives.   Andrews said that the search warrant was secured after that point, although most of the marijuana evidence had been seized.

Andrews reiterated that other than being serious, the tone of the interrogation was cordial.   Petitioner received water several times and was never in handcuffs or restraints.   He offered information about an Ivan LNU near Crystal River who was buying from the operation.   Andrews noted that Petitioner never asked for any favors, was polite and cordial, and although concerned because he was obviously in trouble, was "disciplined" in how he responded to the agents.   He agreed that Petitioner and Burns were kept apart, but noted that this was so Burns could occupy the child.

Agent Andrews admitted that he could not observe what happened at the gate to the property before he had contact with Petitioner.   He noted, however, that as Petitioner walked toward the house he was not

handcuffed or in any kind of restraints, and Andrews had no personal

knowledge of anyone drawing their weapons.

Special Agent Andrews commented that he found it unusual that the

Petitioner's wife was "happy to see" the agents.   He said that she gave

them a hug and said thank you for doing that.   They surmised it was

because she did not feel comfortable living there any longer, and that it was

somewhat of a hostile situation between her and her husband.

Andrews noted that after law enforcement departed that night, the

consent search ended and they had to secure a warrant to come back and

search. With respect to the warrant, Andrews acknowledged that he had

seen it, but said it was not his warrant so he had not reviewed it.

He said that he had not begun to prepare a warrant in advance

because it would be impractical to do this every time a CI calls in.   Law

enforcement has to develop or confirm the information.   He acknowledged

that if Petitioner had not consented to a search, they would have had to

prepare a warrant and maintain the property until the warrant was secured.

Andrews said that based on past practice they could have detained

Petitioner until they had the warrant or were unable to get it, and they

would not have merely packed up and left to come back another day if

Petitioner had not given consent to the search.

## <u>Credibility Determination</u>

The court finds after having observed the Petitioner's demeanor,

reviewing the content of his testimony and submissions to the court that he

is not someone who, as the Government phrased it, has an affection for the

truth.    Petitioner admittedly lied to agents at the time of the search, and,

also admitted that had he been presented with different information, would

have told a different story.    Petitioner also has an obvious incentive to be

untruthful or to shade the facts to benefit him in this instance.

Mr. Bernstein's testimony, on the other hand, appeared credible.    He

has neither a reason to lie nor a personal interest in the outcome of the §

2255 motion.    He is a member in good standing of the Florida Bar and as

such, he is an officer of the court with a duty of candor.    *See* Rule 4-3.3(a)

of the Rules Regulating the Florida Bar ("A lawyer shall not knowingly . . .

make a fast statement of fact or law to a tribunal[.]")    While counsel's

reasons for not pursuing the motion to suppress may not have been fully

clear to his client, it was not a decision counsel took lightly.    He engaged

an investigator in an attempt to uncover weaknesses in the Government's case, despite the abundance of evidence against his client.

The testimony of Agent Andrews, seemed, with the exception of some minor details, to be both consistent with his trial testimony and credible.   He unequivocally stated that he would have obtained a search warrant had the gate been closed, as Petitioner maintains.   Because of the observations law enforcement made from the adjacent property which corroborated Beigel's statements, he believed that agents had probable cause to obtain a search warrant, and there was no need for them to jeopardize this by scaling a locked fence.

<u>Legal Analysis of Fourth Amendment Claim</u>

The court next turns to the question of whether Petitioner had a meritorious claim under the Fourth Amendment.   *Kimmelman*, 477 U.S. at 375.

Curtilage[8]

With limited exception, the Fourth Amendment requires a warrant before the Government can conduct a search of "persons, houses, papers, and effects."   U.S. Const. amend. IV; *Oliver v. United States*, 466 U.S. 170, 176 (1984).   The area "immediately surrounding and associated with the home," the curtilage, is "part of the home itself for Fourth Amendment purposes."   *Oliver*, 466 U.S. at 180; *accord Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013).   That is, while a person's house lies unquestionably within the protection of the Fourth Amendment, unless it lies within the curtilage, the surrounding land might not.   *Oliver*, 466 U.S. at 176.

The curtilage is the area around the home that "harbors those intimate activities associated with domestic life and the privacies of home."

---

[8]   Petitioner relies heavily in his reply brief upon the Hambelton case cited above. In Hambelton, then District Judge Mickle granted a motion to suppress evidence obtained under strikingly similar circumstances by a group of agents that included Wayne Andrews, the case agent in this case.   The search in Hambelton took place approximately three weeks before the search in Petitioner's case, although the hearing on the motion did not take place until after Petitioner's trial.   United States v. Hambelton, Case No. 1:08cr26/SPM, 2009 WL 722284 (N.D. Fla. Mar. 18, 2009).   A synopsis of relevant case law at the time is largely adopted from the district court's order, because the court would have undoubtedly looked to the same precedent if reviewing a motion to suppress in this case.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

*United States v. Dunn*, 480 U.S. 294, 300 (1987).   In contrast, "open

fields," may include any unoccupied or undeveloped area outside the

curtilage, even if the areas are neither "open" nor a "field" as those terms

are commonly understood.   *See Dunn*, 480 U.S. at 304, quoting *Oliver*,

466 U.S. at 180 n.11.   Under the Fourth Amendment, open fields and

public places are constitutionally identical.   *Dunn*, 480 U.S. at 304.   Even

if an individual has taken steps to establish a zone of privacy in an open

field, such as by erecting fences and "no trespassing" signs around his

property, his subjective expectation of privacy does not rise to the level of

one meriting the protection of the Fourth Amendment.   *Oliver*, 466 U.S. at

182.

Law enforcement may access and search open fields without a

warrant even if the land is secluded, fenced, and posted to keep out

trespassers.   *Oliver*, 466 U.S. at 182.   Although the law of trespass

permits exclusion of unwanted intruders, it does not follow that this right to

exclude embodies a privacy interest also protected by the Fourth

Amendment.   *Oliver*, 466 U.S. at 184 n. 15.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

The curtilage does not necessarily extend to a fence or property line.

*Dunn*, 480 U.S. at 301 n.4.   Instead, the curtilage is determined by an

examination of factors that "bear upon whether an individual reasonably

may expect that the area in question should be treated as the home itself"

because the area harbors the "intimate activity associated with the sanctity

of a man's home and the privacies of life." *Id.* at 301 (quotations omitted).

The Court identified the four factors as: (1) the proximity of the area to the

home; (2) whether the area is included within an enclosure surrounding the

home; (3) the nature of the uses to which the area is put; (4) the steps

taken by the resident to protect the area from observation by people

passing by.   *Id.* (citations omitted).   Despite identifying these factors, the

Court noted that they were merely useful analytical tools, and that a

combination of the factors did not necessarily produce a "finely tuned

formula" that would yield a "'correct' answer to all extent of curtilage

questions."   *Id.*

Because of Petitioner's reliance on *Hambelton*, a comparison with the

facts of that case is instructive.   In *Hambelton*, defendant moved to

suppress evidence obtained after law enforcement scaled his locked gate

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

to knock on the front door of his secluded, rural home and obtained his consent to a search.   Defendant Hambelton maintained that his consent to search was tainted by the illegal entry, or alternatively, that the consent was invalid because it was involuntary.

With respect to the issue of the officers' entry into the curtilage, the *Hambelton* court found that the entire three to four acre fenced area around the defendant's home could not be deemed curtilage, but that the officers had walked up the driveway to the area immediately surrounding the house and were thus within the curtilage.   In reaching this conclusion, the court did not focus on the fact that agents had climbed over a padlocked gate with posted no trespassing signs.   *Hambelton*, 2009 WL 722284 at *3; *See also United States v. Rodriguez*, 1:08cr32/SPM, 2009 WL 762203 (Mar. 18, 2009) (agents exceeded the scope of a permissible knock and talk by deactivating a closed electronic gate to gain access to the defendant's house).   The record in this case contains conflicting evidence about whether the gate was locked.   Petitioner stated in his affidavit that the gate was locked.   At the hearing, both he and his wife testified that they "always" locked the gate.   Neither offered any specific testimony about

whether the gate was locked on the evening in question.    To the contrary,

Agent Andrews testified at trial both from his own recollection and in

describing a video taken at the time of the events in question, that the gate

was open.    (*See* ECF No. 67, 103).    He repeated this testimony at the

evidentiary hearing, and stated unequivocally "if the gate had been locked

and closed I would not have done it that way.    If I did not have that option,

I would have gotten a warrant."    The court finds more persuasive Agent

Andrews' testimony that the gate was open at the time they approached.

Although law enforcement entered into the curtilage to knock on the door of

the home, in light of the open gate, any "intrusion" is minimal.

Next, the *Hambelton* court noted that the area near the defendant's

house was enclosed by heavy natural vegetation as well as a fence. Thus,

the curtilage was marked and identifiable to agents who entered and stood

outside defendant's front door and at the sides of his house.

Third, the *Hambelton* court noted that the use of the area broached

by law enforcement made it part and parcel of defendant's home, because

unlike many homeowners, defendant did not leave the entrance open to

social and business guests, but rather he took obvious pains to keep

visitors out.    He posted two guard dog warning signs on the locked gate,

there was a sign with his business phone number on a sign by the gate so

that visitors would call him instead of entering his property, and he kept his

mailbox across the street, outside the fenced area such that even the mail

carrier would not need to enter. *Hambelton*, 2009 WL 722284 at *4.    In

sum, he restricted and discouraged access to this area, and also provided

an alternative means for visitors to contact him.    As in *Hambelton*,

Petitioner's property had posted "no trespassing" and "beware of dog"

signs, and his mailbox was outside the fence.    However, unlike the

Hambelton defendant, there was no posted "alternative means for visitors

to contact" Petitioner Treffinger from outside the perimeter of the property.

Agent Andrews testified at the hearing that the dog was not a factor and it

"did not even bark."    And, as the court has found, the gate was not closed

at the time law enforcement entered the property.

The final issue in *Hambelton* was the steps the defendant had taken

to protect the area from public observation, by maintaining the heavy

vegetation and a surrounding fence.    In the case at bar, photographs

introduced at the hearing showed that Petitioner's house, while not

completely unexposed, was visible from the road.   While the mobile home,

travel trailer and outbuildings on Petitioner's property may not have been

visible from the main road, agents were able to make auditory and olfactory

observations from beyond the curtilage of Petitioner's property on adjacent

land.   (ECF No. 91 at 66-67.)

Thus, although there are notable factual similarities between the case

at bar and *Hambelton,* there are enough differences that *Hambelton* does

not direct a finding that law enforcement violated the Fourth Amendment in

this case.   They entered the curtilage of Petitioner's property through an

open gate to approach a home at least partially visible from the road to

conduct a knock and talk.

## Consent

Assuming for sake of argument an allegedly warrantless intrusion

onto the curtilage, the Government may avoid suppression of the evidence

located therein if it can show that Defendant's subsequent consent to

search was voluntary and "sufficiently an act of free will to purge the

primary taint of the unlawful invasion," or alternatively that the causal

connection between the warrantless entry and the consent had "become so

attenuated as to dissipate the taint."   *United States v. Delancy*, 502 F.3d

1297, 1309 (11th Cir. 2007) (*quoting Wong Sun v. United States,* 371 U.S.

471, 486-87 (1963)); *Hambelton*, 2009 WL 722284 at *5 (quoting *Delancy*).

The Government has not offered significant analysis of this issue in either

its initial or supplemental brief, appearing to accept the consent at face

value.   However, under the circumstances of this case, whether the

consent was valid is a fact specific inquiry with no single fact weighing out

as dispositive.   *Delancy*, 502 F.3d at 1309 (citing *Brown v. Illinois*, 422

U.S. 590, 603 (1975)).   In accordance with *Delancy*, the court must first

determine whether the consent was voluntary, and second whether the

evidence discovered following the consent should be excluded as tainted.

Voluntariness

It is the Government's burden to show that Defendant's consent to

search was voluntary.   *Schneckloth v. Bustamante*, 412 U.S. 218, 222

(1973).   The term "voluntary," as the *Schneckloth* Court recognized, is not

subject to easy definition, and there exists no talismanic definition,

mechanically applicable to the host of situations in which the subject has

arisen.   *Id.* at 224.   In assessing voluntariness, courts must acknowledge

and balance the "need for police questioning as a tool for the effective

enforcement of criminal laws" with society's deeply felt belief that the

"criminal law cannot be used as an instrument of unfairness and that the

possibility of unfair and even brutal police tactics poses a real and serious

threat to civilized notions of justice."   *Id.* at 225 (citations omitted).

The inquiry into voluntariness focuses on the totality of the

circumstances and a multitude of factors including whether consent to

search was obtained by duress or coercion, expressed or implied.

*Schneckloth*, 412 U.S. at 226-228.   It is not only blatant and intentional

coercion that potentially presents constitutional issues.   That is the crux of

the inquiry here.   "[A]ccount must be taken of subtly coercive police

questions, as well as the possibly vulnerable subjective state of the person

who consents."   *Id.* at 229.   Some factors to consider include whether the

defendant was free to leave, the existence of coercive police procedure,

the extent of defendant's cooperation or awareness of a right to refuse

consent or the ability to refuse consent, the extent of defendant's education

and intelligence and whether the defendant believed that no incriminating

evidence would be uncovered.   *See United States v. Ramirez-Chilel*, 289

F.3d 744, 752 (11th Cir. 2002); *Schneckloth*.

The record evidence in this case establishes that upon his arrival

home, Petitioner was not free to leave.   Agent Andrews had requested

that he return to his home, a request that Petitioner admitted he would not

have honored but for his family's presence at the premises under the

supervision of law enforcement.   He testified at the hearing that he did not

feel like he would have been able to leave, and Agent Andrews confirmed

that once Petitioner arrived at the property, he was effectively in custody

and unable to leave.

In light of this court's finding that law enforcement's entry onto the

curtilage of Petitioner's property was not improper, this entry in and of itself,

unlike in *Hambelton,* was not coercive under the law.   The police tactics

were not inherently coercive.   At least three officers testified at trial that

they wore clothing or items identifying them as law enforcement during their

entry onto the property.   (ECF No. 91 at 38 (Kelly), 58 (Andrews); ECF No.

93 at 17 (Devinny)).   Nonetheless, Petitioner's wife was alarmed enough

by their presence to hide within her home and call 911.   Petitioner's wife's

state of mind is only marginally relevant to the issue of coercion, as Petitioner did not specifically testify that he consented to a search because of this.

There is also conflicting evidence in this case about whether the officers drew their weapons upon Petitioner's arrival.   Petitioner's own testimony is the only evidence that any law enforcement officer had drawn his weapon or pointed it at Petitioner when he drove up to his property.   In light of the information provided by Beigel regarding Petitioner's paranoia and possession of firearms, it would not have been beyond the bounds of propriety for officers to meet him with weapons drawn.   Furthermore, even assuming Petitioner's version of events is correct, these officers were removed physically and temporally from Petitioner's conversation with Agent Andrews about consent.   Petitioner admitted that as he approached the house where he ultimately signed the consent form, no weapons were displayed and he was never handcuffed or restrained in any manner.

The *Hambelton* defendant testified that Agent Andrews had told him that the search would be conducted "the easy way or the hard way," which is the identical language Petitioner claims was used in this case.   (*See*

ECF No. 144 at 60.)   The undersigned finds this claim to be somewhat suspect, but in any event, use of this language is not inherently coercive.

The next factor that the *Hambelton* court considered was the degree of the defendant's cooperation or his awareness of the right to refuse consent and his ability to refuse consent.   The court concluded that because Hambelton had given consent to search within two minutes of answering the door, it was not voluntary.

Petitioner in this case signed a DEA Form 88 less than ten minutes from the time he encountered law enforcement at the entrance to his property.   (*See* ECF No. 91 at 75-77; ECF No. 144 at 11.)   He did so, according to Agent Andrews' testimony both at trial and after the evidentiary hearing, after Andrews had explained that Petitioner could cooperate and "do a consensual agreement" or wait for law enforcement to apply for a search warrant.   (ECF No. 91 at 75).   While the two alternatives may have seemed unattractive to Petitioner, Agent Andrews' explanation of the two options is not inherently coercive.   Petitioner made a decision relatively quickly, but this does not necessarily support a claim of coercion.   Agent Andrews testified at the hearing that Petitioner evidenced

an intent to cooperate from their first phone conversation.   There is no

evidence that he was pressed for a quick decision at the scene and that he

either requested time to think about it or to speak to an attorney.   The

concern Petitioner now mentions that he had for his family is supported by

Andrews' testimony both at trial and at the evidentiary hearing that

Petitioner was "concerned about this child and he asked for us to take that

into consideration," and that after Andrews agreed to try to minimize his

exposure and the agents' exposure to the child, Petitioner agreed to sign

the DEA Form 88.   (ECF No. 91 at 75).   Similarly, in *Hambelton*, the court

found that the defendant's concern for his child "affected his decision to

consent to the search, and undercuts the voluntariness of his consent."

*See Hambelton*, 2009 WL 722284 at *6. However, under the totality of the

circumstances, it seems akin to Petitioner making the choice that he

believed was best for his family.

Agent Andrews testified at trial and at the hearing that there was no

threat or coercion shown to Petitioner before he signed the consent form,

and that the form requires him to acknowledge same.   (ECF No. 91 at 77).

Additionally, Agent Andrews testified that no threats were directed toward

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Petitioner's wife.   (*Id.*).    Agent Devinny, who was also present, testified

similarly at trial.   (ECF No. 93 at 21-22.).    Devinny further testified that the

consent form was read to Petitioner word for word before he signed it,

unlike the Hambelton defendant who apparently did not read the form

before signing.   (ECF No. 91 at 75; ECF No. 93 at 22; *Hambelton* 2009

WL 722284 at *6).    The *Hambelton* court did not find the fact that the form

included language of assent to be dispositive as it did not expressly inform

the defendant that he could refuse to consent.    Refusal, however, would

have been demonstrated by declining to sign the form.

Petitioner does not contest that he understood that he was being

asked for consent to search the premises.    He was educated and

intelligent, and none of the officers testified that he appeared to be under

the influence of any controlled substances at the time.    Despite his

admission that he had smoked marijuana that day, Petitioner does not

suggest that this was a factor in his consent.    In *Hambelton,* the court

factored into its analysis defendant's surprise to find officers at the door to

his home.    Petitioner in this case may have been surprised by the initial

call from law enforcement.    However, he certainly expected their presence

at the property when he arrived, and he had the presence of mind to stop along his route and hide both a firearm and marijuana before proceeding to his property.

The final factor considered by the *Hambelton* court was whether the defendant believed officers would not find incriminating evidence.   Neither *Hambelton* nor this case presented a situation in which a defendant who had hidden incriminating evidence voluntarily gives consent to search because he believes law enforcement will not find it.   Both Hambelton and Petitioner in this case led officers to marijuana plants and weapons on their property.   Counsel relied heavily on the video in which Petitioner appears to be somewhat of a tour guide leading law enforcement to the weapons and marijuana on his property.

In sum, Petitioner knew that his wife had been scared by strangers running around their secluded rural property before he was summoned home.   He had approximately 45 minutes to comprehend the situation on his drive, during which he chose to discard a gun and marijuana.   When Petitioner arrived, he was unable to speak with his wife and child. Petitioner was concerned about minimizing his son's contact with law

enforcement, and he was reassured that giving consent to search would do

this.    Agent Andrews also told him that law enforcement was going to

search his property regardless, because they had sufficient information to

obtain a search warrant based on the information provided by the informant

and the corroborating information they gained from the adjacent property.

Because of the weapons believed to be on the property, the property would

have to be secured until the warrant was obtained.    This was factual

information about routine police procedure.    Petitioner was not restrained

in any way or threatened during his conversation with Agent Andrews.

Petitioner's contact with law enforcement, under the circumstances, was

certainly not invited or pleasant.    However, any discomfort arising from the

situation was not such that Petitioner's consent to the search was rendered

involuntary under the totality of the circumstances in this case.

## Effect of Prior Unlawful Entry

This does not end the inquiry, however. In the event the court were to

have found the entry onto the property to be unlawful, the court must

determine whether Petitioner's consent was free from or tainted by the prior

entry.    This question overlaps factually to some extent with the

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

assessment of the voluntariness of the consent.   The *Delancy* court

identified three factors that are useful in the analysis:   (1) temporal

proximity; (2) intervening circumstances, and (3) the purpose and flagrancy

of the official misconduct.   *Delancy*, 502 F.3d at 1309 (quoting *United*

*States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000)).

In *Hambelton*, law enforcement's warrantless entry onto the subject

property and the receipt of consent to search were virtually

contemporaneous.   Although Petitioner Treffinger was not on his property

when the agents effectuated their entry, he arrived perhaps an hour later,

while agents were still present.   There were no intervening circumstances

that attenuated the effect of his knowledge of the entry.

With respect to the flagrancy and purpose of the misconduct, in

*Hambelton*, it was agents' entry onto the defendant's curtilage which

enabled Agent Andrews to smell the marijuana and led to the defendant's

consent.   *See also United States v. Rodriguez*, Case No. 1:08cr32/SPM,

2009 WL 762203 (N.D. Fla. 2009).   In contrast, in the instant case, agents'

corroborated the information they had received from Beigel from the

adjacent land.   In light of Beigle's description of the quantity of weapons

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

present, Petitioner's paranoid behavior and propensity for violence, and a possible battered woman on the premises, Andrews believed that although he had enough information to secure a warrant, timing was right to effectuate a knock and talk by passing through the open gate.   No additional evidence was obtained on the property until after Petitioner returned home.

Even if the agents' entry onto the property had some effect on Petitioner's decision, under the facts of this case, virtually the same conversation could have ensued absent the entry. The only "leverage" the entry offered was that Petitioner's wife and child were outside their home. Even if this affected Petitioner's decision to consent, under the totality of the circumstances the court finds that his consent was not tainted by law enforcement's entry onto his property to conduct the knock and talk.

Conclusion

Even in situations where probable cause exists, law enforcement officers "are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the

amount necessary to support a criminal conviction." *United States v.*

*Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (*quoting Hoffa v. United States*,

385 U.S. 293, 310 (1966).   As the Supreme Court recognized in

*Schneckloth*, there are practical reasons that may favor a consent search

over a warrant search such as convenience of the subject and avoiding the

embarrassment or stigma that may arise through a more formal process.

*Schneckloth*, 412 U.S. at 228.

   While recognizing the similarities with the *Hambelton* case, the

undersigned finds that there are sufficient distinguishing facts that the

district court's ruling on a motion to suppress was not a foregone

conclusion.   In this case, Defendant maintained an expectation of privacy

in the area surrounding his home, although this area was visible from the

road.   Agents entered the perimeter of his property by passing through an

open gate to attempt a knock and talk, knowing Petitioner was not present.

When Petitioner returned home to talk to law enforcement, he weighed the

circumstances presented to him in deciding to consent to a search.   He

cooperated by providing a "guided tour" of the operation, using his own

keys to open buildings and point out salient evidence, although he was untruthful about who bore the responsibility for the operation.

In deciding not to file a motion to suppress, counsel considered the facts and circumstances of this case including the "disconnect" between his client's version of events and what counsel learned through discovery and investigation.   Counsel also considered the possible credibility issues that could arise if Petitioner were required to testify at yet another proceeding. *See Darden v. United States*, 708 F.3d 1225 (11th Cir. 2013).   Finally, counsel factored in his own experience in the *Erickson* case, *United States v. Erickson*, 1:08cr10/SPM in which he unsuccessfully moved to suppress evidence seized pursuant to a search warrant that was supported by allegedly unlawful observations made during a warrantless "knock and talk" entry onto defendant's property.   The record is far from clear that Petitioner had, as he claims, a meritorious Fourth Amendment claim.

Under the circumstances in this case, counsel did not perform deficiently under *Strickland* and *Kimmelman* when he chose not to file a motion to suppress. Therefore, Petitioner's motion should be denied.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."   A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.   Rule 11(b), § 2255 Rules.

After review of the record, the court finds no substantial showing of the denial of a constitutional right.   § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted).   Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."   If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Case Nos.: 1:08cr23/WTH/GRJ; 1:13cv209/WTH/GRJ

Based on the foregoing, it is respectfully RECOMMENDED:

1.  The motion to vacate, set aside, or correct sentence (ECF No.

    144) should be **DENIED.**

2.   A certificate of appealability should be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this 16th day of March, 2017.


*/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge




**<ins>NOTICE TO THE PARTIES</ins>**

  **Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.   <ins>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</ins>   A copy of objections shall be served upon all other parties.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.